## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**NOV 26 2019**

JEFFREY P. COLWELL
CLERK

WYATT T. HANDY JR.,

                    Plaintiff

v.

CITY OF AURORA,

OFFICER ANTHONY NICHOLS,

OFFICER CHRISTOPHER THRIVIERGE

OFFICER JOSIAH COE

OFFICER CHRISTOPHER YARBOROUGH

OFFICER ALEX SOTELO

                    Defendant(s).

## COMPLAINT

## NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.


### A.    PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*


WYATT T. HANDY JR.
P.O. BOX 221531
DENVER, CO 80222
(720) 461-0787
w.t.handyjr@gmail..com


### B.    DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*


Defendant 1: CITY OF AURORA 15151 E. Alameda Pkwy, Aurora CO 80012


Defendant 2: OFFICER ANTHONY NICHOLS; Aurora Police Dept.; 15001 E. Alameda Pkwy; Aurora CO 80012


Defendant 3: OFFICER CHRISTOPHER THRIVIERGE; Aurora Police Dept.; 15001 E. Alameda Pkwy, Aurora CO 80012

Defendant 4: OFFICER JOSIAH COE; Aurora Police Dept; 15001 E Alameda Pkwy; Aurora CO 80012

Defendant 5: OFFICER CHRISTOPHER YARBOROUGH; Aurora Police Dept.; 15001 E Alameda Pkwy; Aurora CO 80012

Defendant 6: OFFICER ALEX SOTELO; Aurora Police Dept.; 15001 E Alameda Pkwy; Aurora CO 80012

## C.  JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

__X__  Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

First Amendment-Freedom of Association; Free Exercise of Religion; Religious Land

Use and Institutionalized Persons Act (RLUIPA); Fourth Amendment-Unreasonable

Search and Seizure; Eighth Amendment- Excessive Bail; Fourteenth Amendment-Equal

Protection & Due Process of Law;

_____  Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of COLORADO

If Defendant 1 is an individual, Defendant 1 is a citizen of

If Defendant 1 is a corporation,

> Defendant 1 is incorporated under the laws of <u>COLORADO</u> (name of state or foreign nation).

> Defendant 1 has its principal place of business in <u>COLORADO</u> (name of state or foreign nation).

D.       STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

CLAIM ONE:  <u>**First Amendment-Freedom of Speech; Right to Petition the Government for**</u>

<u>**a Redress of Grievances; Retaliation; (First and Second Traffic Stop)**</u>

Supporting facts:

1. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set

forth herein.

2. Defendants were acting under color of state law in their actions and inactions which occurred

at all relevant times to this action.

3. This claim one is being leveled against Defendants City of Aurora, Anthony Nichols,

Christopher Thivierge, Josiah Coe, Christopher Yarborough, Alex Sotelo, and other unknown

Aurora Police Officers, in their individual and official capacities, as employees of the City of

Aurora, for knowingly and intentionally subjecting Plaintiff to an unlawful search and seizure of

his vehicle, ultimately resulting in the invasion of his privacy, and in violation of his life, liberty, or property interest , in retaliation for Plaintiff exercising his right to freedom of speech and his right to petition the government for a redress of grievances.

4. On 12/02/17, at 11:35 pm, Plaintiff left the King's Inn Motel, located at: 11800 E Colfax Ave, Aurora, CO. 80010.

5. Plaintiff was on his way to Taco Bell, which is several blocks west of the King's Inn Motel, less than a mile.

6. As Plaintiff pulled out of the King's Inn Motel, headed west on Colfax Ave., towards the Taco Bell, Defendant Thivierge immediately pulled behind him and followed him for several blocks.

7. As Plaintiff turned on his blinker and got in his left lane to pull into the Taco Bell parking lot, Defendant Thivierge turned on his emergency lights to conduct a traffic stop.

8. Several Aurora Police Officers, in approximately 3-4 additional police cars arrived on the scene, to assist Defendant Thivierge, conduct what was supposed to be a routine traffic stop, to include, but not limited to Defendant Nichols, who is the only Officer out of several, to contact dispatch, to document his location.

9. Immediately upon the arrival of several police officers, they approached Plaintiff's vehicle, with Defendant Thivierge initiating the contact.

10. Defendant Thivierge, Nichols, and the other unknown police officers involved in the aforementioned traffic stop, didn't have reasonable suspicion or probable cause to stop Plaintiff, but pulled him over based on the City of Aurora and the Aurora Police Department's unwritten custom, practice and policy, to stop so called African-American/black males, regardless if reasonable suspicion or probable cause exist to stop them, and to search their vehicles, without

reasonable suspicion or probable cause to do so. See Pittman v. Palacio, et al., 19-cv-01947; also see Pittman v. City of Aurora, et al, 19-cv-02209.

11. Plaintiff was confused about the nature of the traffic stop, based on all the additional police officers that arrived, surrounding his car in the Taco Bell parking lot.

12. Plaintiff began complaining about the nature of the stop to Defendants Thivierge and Nichols, regarding the unlawful seizure of his person and vehicle; accused them of racial profiling; requested their names and identification information; and informed them that he was going to file an administrative complaint against them for the misconduct and a lawsuit to litigate the unlawfulness of their actions.

13. Immediately after Plaintiff threatened the Defendant Officers with filing administrative grievances and nonadministrative complaints against them for the unlawful stop and seizure of his person and vehicle, the Defendant Officers became irate and began yelling at Plaintiff; calling him derogatory names, e.g. stupid mother fucker, etc.; making derogatory remarks about his mother, calling her a bitch; and threatening Plaintiff with adverse action, e.g., arresting him (under false pretenses).

14. On 12/03/17, at 2:26 am, approximately 3 hours after the first stop, Plaintiff was stopped again, leaving the King's Inn Motel, on his way to drop off two passengers, by Defendant Nichols, who was involved in the first stop.

15. Several police officers arrived simultaneously, to assist Defendant Nichols, to include, but not limited to, Defendants Coe, Sotelo, and Yarborough.

16. Defendant Nichols immediately approached Plaintiff's vehicle after their arrival and requested his identification documents.

17. Plaintiff provided Defendant Nichols with his license, insurance, and vehicle registration.

18. Plaintiff simultaneously inquired as to the reason for the stop, and Defendant Nichols explained that his license plate lights wasn't working or fully illuminating the license plate.

19. Defendant Nichols returned to his police vehicle presumably to run Plaintiff's information through the ccic/ncic database to do a warrant check.

20. Defendant Nichols returned to Plaintiff's vehicle and demanded him to step out of the car to the back of the vehicle.

21. When Plaintiff complied, Defendant Nichols explained that he smelled alcohol in the car, then requested permission to search the vehicle.

22. Plaintiff took Defendant Nichols language to mean, if he was allowed to search the vehicle, he would overlook the alcohol smell.

23. Plaintiff refused to give consent to Defendant Nichols for the search of his vehicle and was suspicious as to why such action was his concern.

24. Immediately after Plaintiff refused to give Defendant Nichols consent to search his vehicle, he became openly agitated and went into the roadside sobriety test protocol to determine if Plaintiff had been drinking alcohol.

25. Plaintiff refused to submit to the sobriety test and was immediately placed under arrest by Defendant Nichols for DUI based on the refusal.

26. Defendant Nichols then searched Plaintiff's person and took all the contents out of his pockets, including the keys to Plaintiff's vehicle.

27. Upon finding Plaintiff's car keys, Defendant Nichols placed him in the backseat of his patrol car, and informed Plaintiff that he was having the vehicle impounded and conducting an "inventory search" of the vehicle in the process.

28. Defendant Nichols proceeded to the vehicle and told the passengers to leave. Once the passengers were out of the vehicle, Defendant Nichols and the other Defendant police officers began unlawfully searching the Plaintiff's vehicle under the false pretenses of a "inventory search," looking for drugs.

29. During the search Defendants found a handgun in the glove compartment, which they unlocked to search.

30. Plaintiff was ultimately charged with DUI and possession of a weapon by a previous offender ( POWPO), and convicted of DUI and a misdemeanor weapons related offense.

31. Plaintiff is not challenging the legality of the second traffic stop, nor is he challenging the convictions that resulted from the second traffic stop.

32. Plaintiff is challenging the first traffic stop in its entirety, however, in the second traffic stop, he's only challenging the unlawfulness of the search and seizure of his vehicle.

33. Plaintiff contends that the Defendants illegally searched his vehicle, in violation of the Fourth Amendment to the United States Constitution, Federal law, and the City of Aurora and Aurora Police Department policy, with regard to the second traffic stop; and the unlawful search and seizure of his vehicle, is an adverse action, and direct result of Plaintiff threatening the Defendants with administrative complaints and lawsuits.

34. Plaintiff was engaged in protected activity of speaking out in the face of police abuse during the first traffic stop.

35. The unlawful search and seizure of Plaintiff's vehicle as described in this complaint were caused by Defendants Thivierge and Nichols retaliatory animus toward Plaintiff's expressive activity.

36. The unlawful search and seizure of Plaintiff's vehicle described in this complaint served no lawful purpose.

37. Defendants caused Plaintiff's vehicle to be unlawfully searched and seized without probable cause in retaliation for Plaintiff's expressive activity.

38. Defendants are not entitled to qualified immunity for the complained of conduct because they violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendants position knew or should have known. See City of Houston v. Hill, 482 U.S. 451 (1987) (recognizing a First Amendment right to verbally oppose or challenge police action).

39. The City of Aurora, and the Aurora Police Department directives manual ( policy and procedure), Title: 08.16.1: Towing and Release of Vehicles and Property, states in pertinent part, "Members are authorized to tow a vehicle from a street or any public way or place under the circumstances listed in Sec. 134-37 (authority to impound vehicles) or Sec. 134-148 (abandoned vehicle on street or highway) of the code."

40. The policy furthermore states, "In 'normal' arrest situations where the arrestee is in control of the vehicle and the vehicle is not needed as evidence, posing an imminent threat to public safety, or there is no probable cause to seize the vehicle, the option to leave the vehicle at the scene (moved to a place of safety if needed) or released to another party must be presented to the arrestee."

41. Most importantly, the policy states, "A vehicle left at the scene may be released at the scene to a responsible, licensed party wish the permission of the arrested driver. Vehicles will not be released to any person who is intoxicated or is suspected of being impaired."

42. The Aurora Police Department policy on towing vehicles is sound and has no room for discretion, nor does it support the actions of the Defendants who were set out to illegally search Plaintiff's vehicle in retaliation for Plaintiff's expressive activity and speech during the first traffic stop.

43. Clearly, the facts show that the Defendants were acting in "bad faith" with the unlawful search of Plaintiff's vehicle, were Defendant Nichols made it known, that searching the vehicle was his objective, when he immediately asked Plaintiff's consent to search the vehicle at the outset of the traffic stop; were the decision to tow the vehicle and the subsequent search of the vehicle, was outside the frame of the policy; and most astonishing, Defendants failed to ask Plaintiff, if he would be ok with his vehicle being released to one of his passengers, who weren't intoxicated and had valid driver's licenses. See Colorado v. Bertine, 479 U.S. 367 (1987).

44. In Vigil v. Superior Court, County of Placer, the court, in the face of Cooper, held that an inventory search of defendant's vehicle violated the petitioners Fourth and Fourteenth Amendment rights. In disproving an earlier decision, the court found that custodial possession is not an inevitable concomitant of an arrest of the driver: We hold that the constitution does not permit and otherwise authorize search of a car simply because police have statutory authority to arrest and take an accused before a magistrate plus the right to cause the automobile to be removed from the highway. People v. Anderson, 6 Cal. App. 3d 428, 85 Cal. Rptr. 908 (1970).

45. The court did not appear to question the right of police to take an inventory of a vehicle if the vehicle has been properly impounded. The court pointed out that petitioner was accompanied by two other occupants of the vehicle, who, with the consent of the arrestee, could have been given possession of the vehicle, thus avoiding the need for impounding. See id. at 133, 73 Cal. Rptr. at 797.

46. The Court's ruling in Heck denied the accrual of a §1983 claim for damages that would imply the invalidity of the plaintiff's conviction or sentence. In footnote seven of its opinion, the Court provided an example of a claim that might not imply the invalidity of the underlying conviction or sentence and that, consequently, would not require favorable termination: For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the §1983 plaintiff's still outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful. In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, which, we hold today, does not encompass the "injury" of being convicted and imprisoned (until his conviction has been overturned). Heck v. Humphrey, 512 U.S. 477, 487 n. 7 (1994).

47. Upon information and belief, Defendant Yarborough was the employee with the final policymaking Authority on the scene, and had authority over his subordinate Law Enforcement Officers, Defendants Nichol, Coe, Sotelo, and other unknown Aurora Police Officers.

48. Through Defendant Yarborough's own unlawful conduct, which condones the conduct of Defendants Nicholls, Coe, Sotelo, and other unknown police officers, Defendant Yarbrough, on behalf of the City of Aurora, ratified the unconstitutional practices of Defendants Nichols, Coe, Sotelo, and other unknown police officers. Defendant's actions caused, directly and proximately, Plaintiff to suffer damage.

49. Defendants, as described above, were acting recklessly, knowingly, intentionally, willfully and wantonly, caused Plaintiffs injuries.

Second Claim: **Fourth Amendment- Unlawful Seizure (First Traffic Stop):**

Supporting Facts:

50. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

51. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

52. This claim two is being leveled against Defendants City of Aurora, Anthony Nichols, Christopher Thivierge, and other unknown Aurora Police Officers, in their individual and official capacities, as employees of the City of Aurora, and the Aurora Police Department.

53. This civil action, filed by W. T. Handy Jr., here in the Plaintiff, encompasses the unlawful seizure of the Plaintiff, by Defendants during a "Terry" stop, where none of the Defendants at any time had probable cause, reasonable suspicion, or any other legal basis to believe that Plaintiff had committed or were committing any crimes prior to the unlawful seizing and

continued restraint of his person, effectively violating Plaintiff's Fourth Amendment rights to the United States Constitution.

54. In effectuating the unlawfulness of the seizure of Plaintiff's person and vehicle, the named Defendants violated Plaintiff's due process rights under the Fourteenth Amendment of the United States Constitution, where they conducted a "Terry" stop (investigative stop), without articulable probable cause, reasonable suspicion, or any other legal basis to believe that Plaintiff had committed or we're committing crimes.

55. Furthermore, Plaintiff's race was a motivating factor in the decision of Defendants to stop, detain and threaten Plaintiff, undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment.

56. Defendants had an independent motive to subject the Plaintiff to reprisals, and collectively encouraged, promoted and/or participated in an overall objective to subject the Plaintiff to an unlawful seizure.

57. On 12/02/17, at 11:35 pm, Plaintiff left the King's Inn Motel, located at: 11800 E Colfax Ave, Aurora, CO. 80010.

58. Plaintiff was on his way to Taco Bell, which is several blocks west of the King's Inn Motel, less than a mile.

59. As Plaintiff pulled out of the King's Inn Motel, headed west on Colfax Ave., towards the Taco Bell, Defendant Thivierge immediately pulled behind him and followed him for several blocks.

60. As Plaintiff turned on his blinker and got in his left lane to pull into the Taco Bell parking lot, Defendant Thivierge turned on his emergency lights to conduct a traffic stop.

61. Several Aurora Police Officers, in approximately 3-4 additional police cars arrived on the scene, to assist Defendant Thivierge, and had his vehicle boxed in, for what was supposed to be a routine traffic stop, to include, but not limited to Defendant Nichols, who is the only Officer out of several, to contact dispatch, to document his location.

62. Immediately upon the arrival of several police officers, they approached Plaintiff's vehicle, with Defendant Thivierge initiating the contact.

63. Defendant Thivierge, Nichols, and the other unknown police officers involved in the aforementioned traffic stop, didn't have reasonable suspicion, probable cause, or any other legal basis, to stop Plaintiff, but pulled him over based on the City of Aurora and the Aurora Police Department's unwritten practice, policy or custom, to stop so called African-American/black males, regardless if reasonable suspicion or probable cause exist to stop them. See Pittman v. Palacio, et al., 19-cv-01947; also see Pittman v. City of Aurora, et al, 19-cv-02209.

64. Plaintiff was confused about the nature of the traffic stop, based on all the additional units that arrived, surrounding his car in the Taco Bell parking lot.

65. Plaintiff began complaining to Defendants Thivierge and Nichols about the unlawful seizure of his person and vehicle; accused them of racial profiling; requested their names and identification information; and informed them that he was going to file an administrative complaint against them for the misconduct and a lawsuit to litigate the unlawfulness of their actions.

66. Immediately after Plaintiff threatened the Defendant Officers with filing administrative grievances and nonadministrative complaints against them for the unlawful stop and seizure of his person and vehicle, the Defendant Officers became irate and began yelling at Plaintiff; calling him derogatory names; and threatening Plaintiff with adverse action, e.g., arresting him (under false pretenses).

67. Defendants made it clear to Plaintiff that he was not free to go.

68. Defendants Thivierge and Nichols, did not have probable cause, reasonable suspicion, or any other legal basis to believe that Plaintiff had committed, or was committing any crimes prior to the unlawful seizure or continued restraint of his person.

69. Defendants did not release Plaintiff until they were sure that he did not have any outstanding warrants.

70. Plaintiff assert that, the reason for the "Terry" stop, was "driving while black." Defendant Thivierge seen Plaintiff as Plaintiff was leaving the King's Inn Motel on his way to Taco Bell.

71. Defendants unlawfully seized Plaintiff when they detained him during the initial traffic stop.

72. Plaintiff has a constitutionally protected right to be secure in his person against unreasonable seizures.

73. No Defendant Officer, at anytime had probable cause, reasonable suspicion, or any legal basis to believe that Plaintiff had committed any crime, or was committing any violation of the law prior to the seizure and continued restraint of his person.

74. Defendants had no warrant within their possession, authorizing the seizure of the Plaintiff.

75. No legally recognizable exigent circumstances existed, which would have justified or permitted Defendants' conduct.

76. Defendants actions were objectively unreasonable in lieu of the circumstances confronting them.

77. Defendants intentionally, willfully and wantonly stopped and seized Plaintiff, as described herein, without justification, in whole or in part, due to Plaintiff's race.

78. As a legal and proximate result of Defendants actions, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

79. Defendants, as described above, were acting recklessly, knowingly, intentionally, willfully and wantonly, caused Plaintiffs injuries.

Third Claim: **Fourth Amendment- Unlawful Search (Second Traffic Stop):**

   Supporting Facts:

80. Plaintiffs hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

81. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

82. This claim three is being leveled against Defendants City of Aurora, Anthony Nichols, Josiah Coe, Christopher Yarborough, Alex Sotelo, and other unknown Aurora Police Officers, in their individual and official capacities, as employees of the City of Aurora, and the Aurora Police Department.

83. This civil action, filed by W. T. Handy Jr., here in the Plaintiff, encompasses the unlawful search of the Plaintiff's vehicle, by Defendants during a "Terry" stop, where none of the Defendants at any time had probable cause, reasonable suspicion, or any other legal basis to search Plaintiff's vehicle, effectively violating Plaintiff's Fourth Amendment rights to the United States Constitution.

84. In effectuating the unlawfulness of the search of Plaintiff's vehicle, the named Defendants violated Plaintiff's due process rights under the Fourteenth Amendment of the United States Constitution, where they conducted an unlawful search of Plaintiff's vehicle, without articulable probable cause, reasonable suspicion, or any other legal basis to search Plaintiff's vehicle.

85. Defendants had an independent motive to subject the Plaintiff to reprisals, and collectively encouraged, promoted and/or participated in an overall objective to subject the Plaintiff to an unlawful search of his vehicle.

86. Defendants made it clear to Plaintiff that they were having his vehicle towed and conducting an "inventory" search of the vehicle, although they knew it was unlawful to do so, based on their own Aurora Police Department policy and constitutional law, because Plaintiff had passengers that the vehicle could've been released to

87. Defendants Nichols, Coe, Yarborough, Sotelo, and other unknown Aurora Police Officers, did not have probable cause, reasonable suspicion, or any other legal basis to search Plaintiff's vehicle.

88. Plaintiff assert that, the reason for the unlawful search of his vehicle is because he is black, and because Defendant Nichols seen Plaintiff leaving the King's Inn Motel on his way Home.

89. Defendants "unlawfully" searched Plaintiff's vehicle when they "legally" detained him during the initial traffic stop.

90. Plaintiff has a constitutionally protected right to be secure in his person against unreasonable searches.

91. No Defendant Officer, at anytime had probable cause, reasonable suspicion, or any legal basis to search Plaintiff's vehicle, effectively violating Plaintiff's Fourth Amendment rights to the United States Constitution.

92. Defendants had no warrant within their possession, authorizing the search of Plaintiff's vehicle.

93. No legally recognizable exigent circumstances existed, which would have justified or permitted Defendants' conduct.

94. Defendants actions were objectively unreasonable in lieu of the circumstances confronting them.

95. On 12/03/17, at 2:26 am, approximately 3 hours after the first stop, Plaintiff was stopped again, leaving the King's Inn Motel, on his way to drop off two passengers, by Defendant Nichols, who was involved in the first stop.

96. Several police officers converged on the scene simultaneously, to assist Defendant Nichols, to include, but not limited to, Defendants Coe, Sotelo, and Yarborough.

97. Defendant Nichols immediately approached Plaintiff's vehicle after their arrival and requested his identification documents.

98. Plaintiff provided Defendant Nichols with his license, insurance, and vehicle registration.

99. Plaintiff simultaneously inquired as to the reason for the stop, and Defendant Nichols explained that his license plate lights wasn't working or fully illuminating the license plate.

100. Defendant Nichols returned to his police vehicle presumably to run Plaintiff's information through the ccic/ncic database to do a warrant check.

101. Defendant Nichols returned to Plaintiff's vehicle and demanded him to step out of the car to the back of the car.

102. When Plaintiff complied, Defendant Nichols explained that he smelled alcohol in the car, then requested permission to search the vehicle.

103. Plaintiff took Defendant Nichols language to mean, if he was allowed to search the vehicle he would overlook the alcohol smell.

104. Plaintiff refused to give consent to Defendant Nichols for the search of his vehicle and was suspicious as to why such action was his foremost concern.

105. Immediately after Plaintiff refused to give Defendant Nichols consent to search his vehicle, he became openly agitated and went into the roadside sobriety test protocol to determine if Plaintiff had been drinking alcohol.

106. Plaintiff refused to submit to the sobriety test and was immediately placed under arrest by Defendant Nichols for DUI based on the refusal.

107. Defendant Nichols then searched Plaintiff's person and took all the contents out of his pockets, including the keys to Plaintiff's vehicle. Plaintiff's not contesting the lawful search of his person after being lawfully arrested.

108. Upon finding Plaintiff's car keys, Defendant Nichols placed him in the backseat of his patrol car, and informed Plaintiff that he was having the vehicle impounded and conducting an "inventory search" of the vehicle in the process.

109. Defendant Nichols proceeded to the vehicle and told the passengers to leave. Once the passengers were out of the vehicle, Defendant Nichols and the other Defendant police officers began unlawfully searching the Plaintiff's vehicle under the false pretenses of a "inventory search," looking for drugs.

110. During the search Defendants found a handgun in the glove compartment, which they unlocked to search.

111. Plaintiff was ultimately charged with DUI and possession of a weapon by a previous offender ( POWPO), and convicted of DUI and a misdemeanor weapons related offense.

1. 112. Plaintiff is not challenging the legality of the second traffic stop, nor is he challenging the convictions that resulted from the second traffic stop.

113. Regarding the second traffic stop, Plaintiff's only contesting the Constitutionality of the search and seizure of his vehicle.

114. Plaintiff contends, as he stated above, that he had two passengers with him at the time of the second traffic stop, that were licensed drivers, that Defendants should've allowed to move his car and park it in a safe place, providing the place it was stopped wasn't, and/or allowed Plaintiff to release his vehicle to one of the passengers.

115. The aforementioned action is permitted by the City of Aurora, pursuant to Aurora Police Department policy, and not discretionary.

116. Defendants actions in requesting consent to search the vehicle at the commencement of the traffic stop, by informing Plaintiff that they would overlook the alcohol violation if they could search the vehicle; violating City of Aurora and Aurora Police Department policy, by failing to give Plaintiff the option to release his vehicle to one of his passengers; and their actions on body camera footage during the "inventory" search, were you can hear them talk about searching the car for drugs, although that's not the purpose of an "inventory" search, all point to the "inventory" search being conducted in bad faith.

117. Defendants we're not following standardized Aurora Police Department procedures, acted in bad faith, and for the sole purpose of Investigation.

118. The City of Aurora and the Aurora Police Department directives manual ( policy and procedure), Title: 08.16.1: Towing and Release of Vehicles and Property, states in pertinent part, "Members are authorized to tow a vehicle from a street or any public way or place under the circumstances listed in Sec. 134-37 (authority to impound vehicles) or Sec. 134-148 (abandoned vehicle on street or highway) of the code."

119. The policy furthermore states, "In 'normal' arrest situations where the arrestee is in control of the vehicle and the vehicle is not needed as evidence, posing an imminent threat to public safety, or there is no probable cause to seize the vehicle, the option to leave the vehicle at the scene (moved to a place of safety if needed) or released to another party must be presented to the arrestee."

120. Most importantly, the policy states, "A vehicle left at the scene may be released at the scene to a responsible, licensed party wish the permission of the arrested driver. Vehicles will not be released to any person who is intoxicated or is suspected of being impaired."

121. The Aurora Police Department policy on towing vehicles is sound and has no room for discretion, nor does it support the actions of the Defendants who were set out to illegally search Plaintiff's vehicle in retaliation for Plaintiff's expressive activity and speech during the first traffic stop.

122. Clearly, the facts show that the Defendants were acting in "bad faith" with the unlawful search of Plaintiff's vehicle, were Defendant Nichols made it known, that searching the vehicle was his objective, when he immediately asked Plaintiff's consent to search the vehicle at the outset of the traffic stop; were the decision to tow the vehicle and the subsequent search of the vehicle, was outside the frame of the policy; and most astonishing, Defendants failed to ask Plaintiff if he would be ok with his vehicle being released to one of his passengers. See Colorado v. Bertine, 479 U.S. 367 (1987); also see Vigil v. Superior Court, County of Placer, 268 Cal. App. 2d 127 (1968).

123. In Vigil v. Superior Court, County of Placer, the court, in the face of Cooper, held that an inventory search of defendant's vehicle violated the petitioners Fourth and Fourteenth Amendment rights. In disproving an earlier decision, the court found that custodial possession is not an inevitable concomitant of an arrest of the driver: We hold that the constitution does not permit or otherwise authorize the search of a car simply because police have statutory authority to arrest and take an accused before a magistrate plus the right to cause the automobile to be removed from the highway. People v. Anderson, 6 Cal. App. 3d 428, 85 Cal. Rptr. 908 (1970).

124. The court did not appear to question the right of police to take an inventory of a vehicle if the vehicle has been properly impounded. The court pointed out that petitioner was accompanied by two other occupants of the vehicle, who, with the consent of the arrestee, could have been

given possession of the vehicle, thus avoiding the need for impounding. See id. at 133, 73 Cal. Rptr. at 797.

125. Plaintiff contends that, a favorable ruling on this §1983 claim, regarding the unlawful search of his vehicle, will not invalidate the underlying conviction.

126. The Court's ruling in Heck denied the accrual of a §1983 claim for damages that would imply the invalidity of the plaintiff's conviction or sentence. In footnote seven of its opinion, the Court provided an example of a claim that might not imply the invalidity of the underlying conviction or sentence and that, consequently, would not require favorable termination: For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the §1983 plaintiff's still outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful. In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, which, we hold today, does not encompass the "injury" of being convicted and imprisoned (until his conviction has been overturned). Heck v. Humphrey, 512 U.S. 477, 487 n. 7 (1994).

127. The Tenth Circuit has held, that footnote seven exempts illegal search and seizures damages claims from Heck's favorable-termination requirement. See Beck v. City of Muskogee Police Dept., 195 F.3d 553, 559 n.4 (10th Cir. 1999)(advocating general exception approach).

128. In Beck v. City of Muskogee Police Dept., the Tenth Circuit adopted the general exception approach. See id. at 558. The Beck Court determined that Beck's illegal search claim accrued at

the time of the search, and thus the statute of limitations barred the plaintiff from proceeding on

the claim. id. at 558. The court relied on Seventh Circuit opinions and ruled that Heck did not

affect the timing of such claims. See id. ("Heck does not affect the time these claims accrue

because ultimate success on them would not necessarily question the validity of a conviction

resulting from the rape charge or his probation revocation").

129. As a legal and proximate result of Defendants actions, Plaintiff has suffered and continues

to suffer humiliation, emotional distress, loss of enjoyment of life, and other significant injuries,

damages and losses.

130. Defendants, as described above, were acting recklessly, knowingly, intentionally, willfully

and wantonly, caused Plaintiffs injuries.


Fourth Claim: **Fourteenth Amendment-Denial of Equal Protection (First Traffic Stop):**


Supporting Facts:


131. Plaintiffs hereby incorporate by reference all paragraphs of this complaint as if fully set

forth herein.

132. Defendants were acting under color of state law in their actions and inactions which

occurred at all relevant times to this action.

133. This claim four is being leveled against Defendants City of Aurora, Anthony Nichols, Christopher Thivierge, and other unknown Aurora Police Officers, in their individual and official capacities, as employees of the City of Aurora, and the Aurora Police Department.

134. On 12/02/17, at 11:35 pm, while leaving the King's Inn Motel, located at: 11800 E Colfax Ave, Aurora, CO. 80010, on his way to Taco Bell, several blocks west of the King's Inn Motel, Plaintiff was targeted by Aurora Police Department Defendants Thivierge and Nichols, because he is a so-called black/African-American male.

135. As Plaintiff pulled out of the parking lot of the Kings Inn Motel, he was stopped by Defendants Thivierge and Nichols.

136. Defendant Thivierge initiated the stop of Plaintiff because he is a so-called black/African American Male.

137. Immediately after Plaintiff threatened the Defendant Officers with filing administrative grievances and nonadministrative complaints against them for the unlawful stop and seizure of his person and vehicle, the Defendant Officers became irate and began yelling at Plaintiff; calling him derogatory names, e.g. stupid mother fucker, etc.; making derogatory remarks about his mother (calling her a bitch); and threatening Plaintiff with adverse action, e.g., arresting him (under false pretenses).

138. After the incident, Plaintiff filed a complaint with the Aurora Police Department's Internal Affairs Bureau. In response, the bureau stated that the officers had done nothing wrong. These actions are consistent with Aurora's custom of condoning and ratifying unconstitutional behavior by its officers.

139. The City of Aurora, and the Aurora Police Department, has a lengthy and well-documented history of racial profiling, unlawful searches and seizures, excessive force, etc., and because of Aurora's unconstitutional customs, practices and policies, the city of Aurora and is police department has to be transparent with it's data related to traffic stops, and keep records of the race of the people being stopped, rather or not they were searched, etc., called Open Data Policing.

140. Demographically, the City of Aurora is predominantly white.

141. Based on the American Community Survey conducted by the census in 2016, only 20,403 African-Americans, out of a population of 399,756, lives in the census tract where Plaintiff was stopped. African-Americans only make up 10.2% of the city of Aurora. Comparatively, 113,581 whites live in that same census tract, making up 56.5% of the city of Aurora.

142. Although, African-Americans only make up 10.2% of the City of Aurora's population, blacks are twice as likely to be subjected to traffic stop then whites.

143. African Americans are subjected to traffic stops 20% of the time in the City of Aurora. Comparatively, whites makeup 56.5% of the City of Aurora's population, but only subjected to traffic stops 35% of the time, at a significantly less rate than African-American.

144. Even more compelling, is African-Americans persons and vehicles are searched at a significantly higher rate than whites during routine traffic stops.

145. For example, although African-Americans make up 10.2% of the City of Aurora's population, persons and vehicles are searched 26% of the time, in comparison to whites who make up 56.5% of the population, who's persons and vehicles are searched 16% of the time.

146. Plaintiff asserts that the reason for the "Terry" stop, was "driving while black." Defendant Thivierge seen Plaintiff as Plaintiff was leaving the King's Inn Motel on his way to Taco Bell.

147. The incidents involving Plaintiff, standing alone, is sufficient evidence of these customs, policies and/or practices. Yet, there is more evidence of Aurora's unconstitutional customs, policies, and/or practices, regarding Fourth Amendment violations.

148. On November 21, 2018, Jamie Alberto Torres (Mr. Torres) was fixing a car in his garage with friends when a neighbor complained about noises coming from the garage. Two Aurora law enforcement officials, Defendants Ethan Yazdani and Reginald DePass, came to Mr. Torres' home solely to investigate this noise complaint. During the course of the investigation, these Aurora officers brutalized Mr. Torres, who behaved peacefully and respectfully during the entire encounter. Defendant Yazdani illegally ordered Mr. Torres to exit his own garage, threatening to take Mr. Torres to jail. Because Mr. Torres paused momentarily before complying with Defendant Yazdani's illegal order, Defendant Yazdani grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground. Even after handcuffing Mr. Torres, Defendant Yazdani continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times. During this encounter, Mr. Torres repeatedly screamed in pain. Aurora officers immediately began the cover-up. While Mr. Torres was being assaulted by Defendants Yazdani and DePass, his wife, Maria Ibarra, attempted to film the violence. Another Aurora police officer, Kristi Mason, prevented Ms. Ibarra from recording the encounter so as to avoid memorializing her fellow officers' unconstitutional actions. To justify their illegal conduct, the Defendant officers charged Mr. Torres with resisting arrest and failure to obey a lawful order. A jury acquitted Mr. Torres of these charges at trial.

The Aurora Police Department investigated its officers' use of force against Mr. Torres and found no wrongdoing. See Torres v. City of Aurora, #18-cv-02986.

149. On July 13, 2017, one Aurora officer choked-slammed an African-American woman, Vanessa Peoples, while police were performing a welfare check in her home. Several other Aurora officers then piled on Ms. Peoples. What "provoked" the officers' attack was Ms. Peoples' protestations of the officers' misconduct and her failure to be 100% compliant with every single police directive (legal or illegal). Eventually, the officers hog-tied Ms. Peoples so tightly that they dislocated her shoulder. Despite Ms. Peoples' continued cries of pain, Aurora officers kept her hog-tied for 30 minutes with her shoulder dislocated. The Aurora officers had no reason to believe Ms. Peoples had committed a crime; yet they charged her with obstruction. Those charges were later dismissed. Ms. Peoples settled her claims for $100,000 pre-litigation. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions.

150. On April 22, 2017, multiple Aurora police officers tased and assaulted Brandon Washington, an African-American man. The officers had responded to an automobile accident in which Mr. Washington was involved. Upon arriving on scene, the officers used grossly excessive force because Mr. Washington, while still clearly in shock and disoriented from the accident, questioned their commands that he exited his vehicle. In response to this perceived non-immediate compliance, Aurora officers almost immediately dragged Mr.Washington out of his vehicle. One officer tased Mr. Williams multiple times while other officers physically assaulted him. During the assault, Mr. Washington (who has asthma), kept yelling, "I can't breathe." To justify their use of force against a survivor of a recent automobile accident, Aurora

officers charged Mr. Washington with a number of crimes, including resisting arrest. Those charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers. See Washington v. City of Aurora #19-cv-01160.

151. On March 16, 2016, multiple Aurora police officers racially profiled Omar Hassan, an African American man, and ejected him from a coffee shop simply because he was an African-American man wearing a hoodie. The Aurora officers acted solely on the basis of Mr. Hassan's appearance; they had no reasonable grounds for suspecting that he was engaged in any criminal conduct. Aurora officers told Mr. Hassan that he had to leave the coffee shop, because Mr. Hassan's "kind of business [was] not welcome [t]here." When he questioned the directive, one officer placed her hand on her gun, non-verbally threatening Mr. Hassan with use of deadly force. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid Mr. Hassan to settle his legal claims. See Hassan v. Williby, et al., #17-cv-02335.

152. On February 19, 2016, Auroras officers stopped and detained Darsean Kelley simply because he was an African-American man who happened to be in the vicinity of a reported crime. He questioned the officers' orders and demanded to know whether or not he was being detained. Mr. Kelley complied with officers' orders but also asserted "I know my rights" just as one officer tased him in the back. The Aurora officers conducting the stop had no reason to believe that Mr. Kelley had committed a crime or was armed or dangerous. To cover up the illegal stop and the unjustified tasing, Aurora charged Mr. Kelley with failure to follow a lawful order. That charge was eventually dismissed, but Aurora found no misconduct chose not to

discipline any of the officers involved in this unconstitutional detention and use of excessive force. Aurora paid Mr. Kelley $110,000 to settle his legal claims pre litigation.

153. On December 22, 2015, several Aurora officers assaulted OyZhana Williams, an African-American woman, who was simply visiting her boyfriend in the hospital. When Ms. Williams refused the officer's illegal order that she give him the keys to her car, the officer. tackled Ms. Williams, choked her, slammed her head against the ground and then stomped on her head. Aurora officers had no probable cause or reasonable suspicion to believe Ms. Williams had committed any crime. Yet, to cover up their excessive use of force, the officers charged Ms. Williams with a crime and arrested her. The charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid over $350,000 to settle Ms. Williams' claims. See Williams v. Hawkins, et al., #17-cv-02123.

154. On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old, disabled African-American man, out of his home under threat of force, despite the fact that the officers had no warrant and no exceptions to the warrant requirement justified a warrantless arrest in the home. After Mr. Crews complied with the two Aurora officers' illegal commands to exit his home in the middle of the night, the officers forcefully threw him to the ground. The officers assaulted Mr. Crews only because he had momentarily delayed complying with their illegal commands in order to try to prevent his cat from getting out of his house. To cover up their unconstitutional conduct, the Aurora officers charged Mr. Crews with resisting arrest. The judge

dismissed the charge halfway through Mr. Crews' trial. Upon information and belief, Aurora did not discipline the involved officers for their unconstitutional treatment of Mr. Crews. Aurora paid Mr. Crews to settle his legal claims. See Crews v. Gerdjikian, et al., #17-cv-02694.

155. On March 6, 2015, an Aurora police officer shot and killed Naeschylus Vinzant-Carter, an unarmed African-American man. Mr. Vinzant-Carter was being pursued by Aurora's SWAT team, near an elementary school, when he was confronted. One officer then opened fire, killing Mr. Vinzant-Carter. Aurora paid $2,600,000 to settle Mr. Vinzant-Carter's claims. Upon information and belief, Aurora did not discipline any of the involved officers for this use of excessive force. See Naeschylus Carter-Vinzant v. City of Aurora, et al.

156. On July 23, 2011, an Aurora police officer conducting an impromptu police undercover investigation shot and killed Juan Contreras, a Hispanic man. Mr. Contreras had found a set of lost car keys and was attempting to return them to the owner when he was wrongfully suspected of committing a minor crime, and Aurora police shot and killed him. Aurora paid $400,000 to settle Mr. Contreras' claims.

157. On December 18, 2010, Aurora police officers used excessive force in their brutal treatment of Rickey Burrell, an African-American man lying helpless in his bed after suffering a seizure. The officers had responded to a 911 call from Mr. Burrell's family. Rather than render assistance, Aurora officers inexplicably jumped on Mr. Burrell, wrenched his arm behind his back, and handcuffed him. The officers proceeded to roughly drag Mr. Burrell outside, though he was clad only in underwear that he had soiled during his seizure. Mr. Burrell suffered a wrist fracture and other injuries to his back and shoulder as a result of the officers' actions. Aurora paid $100,000 to settle Mr. Burrell's claims. Upon information and belief, Aurora did not

discipline any of the involved officers for their unconstitutional actions. See Burrell v. City of Aurora, Colorado et al, #11-cv-02766.

158. On February 12, 2009, Aurora police officers used excessive force in effecting the arrest of Carla Meza, a Hispanic woman. Aurora officers responded to a domestic violence report after Ms. Meza was accused of assaulting her girlfriend. Officers handcuffed Ms. Meza and proceeded to make homophobic remarks towards her before one of the officers kicked her in the head while she was handcuffed, breaking her eye socket. The officer kicked her in the head because she refused to comply with his unlawful comma

159. When Defendant Thivierge seen Plaintiff he immediately got behind Plaintiff and followed him simultaneously running Plaintiff's license plates through the database.

160. At this time, Defendant Thivierge knew or assumed the occupants of Plaintiff's vehicle were African American.

161. When Thivierge activated his emergency lights Plaintiff pulled into the Taco Bell parking lot and stopped.

162. Simultaneously, Plaintiff's vehicle was surrounded by several Aurora police cars.

163. Defended Thivierge fabricated the reason to justify the unlawful stop of Plaintiff's vehicle.

164. Defendant Thivierge's real reason for stopping Plaintiff is the color of his skin. Defendant Thivierge initiated the traffic stop of the Plaintiff because he was an African-American driver in a predominantly white City, seen leaving the King's Inn Motel.

165. Defendant Thivierge did not have reasonable suspicion to believe that Plaintiff had committed any crimes prior to or during the traffic stop.

166. At the time of these events Plaintiff had a clearly established constitutional right to be free from unlawful seizures and racial profiling by the Aurora Police Department.

167. Defendants City of Aurora and the Aurora Police Department, explicitly approved of all the actions taken by Defendants Thivierge, Nichols, and the unknown police officers, during this incident.

168. Defendants Thivierge and Nichols,  failed to submit reports detailing what occurred during this incident.

169. At the time of the complained of events, Plaintiff had a clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

170. Plaintiff's race was a motivating factor in the decision by Defendants to stop, detain, and illegally seizure his person and vehicle.

171. Defendants conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment.

172. Defendants stopped, detained, and seizured Plaintiff's person without reasonable suspicion or probable cause to believe that he was committing crimes or committed a crime.

173. Plaintiff was not charged with any crimes or offenses as a result of the aforementioned illegal stop, detention, and seizure of his person and vehicle.

174. As a legal and proximate result of Defendants actions, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

175. Defendants, as described above, were acting recklessly, knowingly, intentionally, willfully and wantonly, caused Plaintiffs injuries.

Fifth Claim: **State Tort-Negligence (First and Second Traffic Stop):**

Supporting Facts:

176. Plaintiffs hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

177. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

178. This claim Five is being leveled against Defendants City of Aurora, Anthony Nichols, Christopher Thivierge, Josiah Coe, Christopher Yarborough, Alex Sotelo, and other unknown Aurora Police Officers, in their individual and official capacities, as employees of the City of Aurora and the Aurora Police Department, for knowingly and intentionally subjecting Plaintiff to an unlawful seizure, an unlawful search, racial profiling, and retaliation, ultimately violating the City of Aurora and Aurora Police Department policy under Directives Manual 8.16: Towing and Release of Vehicles and Property; 8.32: Bias-Based Profiling; 14.03: Professional Conduct and Responsibility.

179. Defendants have a legally imposed duty or a standard of conduct under the City of Aurora and the Aurora Police Department's Directives Manual 8.16: Towing and Release of Vehicles and Property; 8.32: Bias-Based Profiling; 14.03: Professional Conduct and Responsibility, that they failed to adhere to.

180. Defendants disregarded Plaintiff's rights and fundamental protections under State and Federal Law.

181. Defendants City of Aurora, Anthony Nichols, Christopher Thivierge, Josiah Coe, Christopher Yarborough, Alex Sotelo, and other unknown Aurora Police Officers, follow an absolute custom, practice and policy of subjecting African-American males to unlawful searches and seizures, and racial profiling, in violation of the City of Aurora, and the Aurora Police Department's policies under Directives Manual 8.16: Towing and Release of Vehicles and Property; 8.32: Bias-Based Profiling; 14.03: Professional Conduct and Responsibility, is tantamount to negligence.

182. Defendants, as described above, were acting recklessly, knowingly, intentionally, willfully and wantonly, caused Plaintiffs injuries.

E.    **REQUEST FOR RELIEF**

Plaintiff requests the following relief:

A) Appropriate declaratory and other injunctive and/or equitable relief as to each Defendant in their individual capacities;

B.) Compensatory and general damages on all claims allowed by law, in an amount to be determined at trial from all defendants named in their individual and official-capacities;

C.) Punitive damages and exemplary damages on all claims allowed by law in an amount to be determined at trial from all defendants named in their individual and official capacities;

D.) A trial by jury;

E.) Pre-and-Post judgment interest at the lawful rate;

F.) Any further relief that this Court deems just, proper and equitable.

F.    **PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct.  *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.; and (4) the complaint otherwise complies with the requirements of Rule 11.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

(Plaintiff's Signature)

11-25-19

(Date)

Legal Mail)!



U.S. POSTAGE PAID
FCM LG ENV
AURORA, CO
8001
NOV 25, 19
AMOUNT
$2.20
R2305M148053-16

1000    80294

W.T. HANDY JR.
P.O. Box 221531
DENVER, CO 80222

UNITED STATES DISTRICT COURT
901 19th STREET
DENVER, CO 80294.

