## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**JAN 3 1 2020**

JEFFREY P. COLWELL
CLERK

Civil Action No. 19-cv-03347-GPG

WYATT T. HANDY JR.                    , Plaintiff

v.

CITY OF AURORA,
OFFICER ANTHONY NICHOLS,
OFFICER CHRISTOPHER THRIVIERGE,
OFFICER JOSIAH COE,
OFFICER CHRISTOPHER YARBOROUGH,
OFFICER ALEX SOTELO,

                              Defendant(s).

(*List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.*)

---

### AMENDED COMPLAINT

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. **Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

1

**A. PLAINTIFF INFORMATION** *You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

WYATT T. HANDY JR.

PO BOX 221531 DENVER CO 80222

(720) 461-0787

w.t.handyjr@gmail.com (Telephone number and e-mail address)

**B. DEFENDANT(S) INFORMATION** *Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1: CITY OF AURORA 15151 E. Alameda Pkwy. Aurora CO 80012

Defendant 2: OFFICER ANTHONY NICHOLS. 15001 E. Alameda Pkwy. Aurora, CO 80012

Defendant 3: OFFICER CHRISTOPHER THRIVIRGE 15001 E Alameda Pkwy Aurora CO 80012

Defendant 4: OFFICER JOSIAH COE 15001 E Alameda Pkwy Aurora CO 80012

Defendant 5: OFFICER CHRISTOPHER YARBOROUGH 15001 E Alameda Pkwy Aurora CO 80012

Defendant 6: OFFICER ALEX SOTELO 15001 E Alameda Pkwy Aurora CO 80012

2

**C. JURISDICTION** *Identify the statutory authority that allows the court to consider your claim(s): (check one)*

X Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

Fourth and Fourteenth Amendment of the US Constitution; Municipal Liability -Deliberate Indifferent Training and Supervision resulting in violations of the Fourth and Fourteenth Amendments (against City of Aurora).

Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of . COLORADO

If Defendant 1 is an individual, Defendant 1 is a citizen of .

If Defendant 1 is a corporation,

Defendant 1 is incorporated under the laws of COLORADO.

Defendant 1 has its principal place of business in COLORADO.

(*If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.*)

3

**D. STATEMENT OF CLAIM(S)** *State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

**First Claim:** <u>**Fourth & Fourteenth Amendment--Unlawful Search & Seizure; Due Process of Law;**</u>

Supporting Facts:

1. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

2. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

4

3. This claim one is being leveled against Defendants City of Aurora, Anthony Nichols, Christopher Thivierge, Josiah Coe, Christopher Yarborough, Alex Sotelo, and other unknown Aurora Police Officers, in their individual and official capacities, as employees of the City of Aurora, and the Aurora Police Department, herein ("APD").

4. This civil action, filed by W. T. Handy Jr., here in the "Plaintiff," encompasses an unlawful seizure of the Plaintiff, and an unlawful search of Plaintiff's vehicle, by Defendants during "Terry" stops, where none of the Defendants at any time had reasonable suspicion, probable cause, or any other legal basis to believe that Plaintiff had committed or were committing any crimes prior to the unlawful seizure, and where none of the Defendants at any time had probable cause to search Plaintiff's vehicle, effectively violating Plaintiff's Fourth and Fourteenth Amendment rights to the United States Constitution.

5. Defendants had an independent motive to subject the Plaintiff to reprisals, and collectively encouraged, promoted and/or participated in an overall objective to subject the Plaintiff to an unlawful search and seizure.

***First Traffic Stop (Unlawful Seizure)***

6. On 12/02/17, at 11:35 pm, Plaintiff left the King's Inn Motel, located at 11800 E Colfax Ave, Aurora, CO. 80010, to get his homeless niece, who lived their, some food, and then some cold medicine.

7. Plaintiff was on his way to Taco Bell first, several blocks west of the King's Inn Motel, less than a mile.

8. As Plaintiff pulled out of the King's Inn Motel, headed west on Colfax Ave., towards the Taco Bell, a police vehicle immediately pulled behind him and followed him for several blocks, later determined to be Defendant Thivierge.

9. As Plaintiff turned on his blinker and got in his left lane to pull into the Taco Bell parking lot, Defendant Thivierge turned on his emergency lights to conduct a traffic stop.

10. Plaintiff then immediately stopped his vehicle and parked in the Taco Bell parking lot, with the building in front of him, and a parking boundary medium to the passenger side of the vehicle.

11. Several Aurora Police Officers, in approximately 3-4 additional police cars arrived on the scene, to assist Defendant Thivierge, with their emergency lights activated, and boxed Plaintiff's vehicle in, for what was supposed to be a routine traffic stop, to include, but not limited to Defendant Nichols, who is the only Officer out of several, to contact dispatch, to document his location.

12. Immediately upon the arrival of the several police officers, Defendant Thivierge, along with Defendant Nichols, and other unknown police officers, approached Plaintiff's vehicle, with Defendant Thivierge initiating the contact.

13. Defendant Thivierge requested Plaintiff's identification documents.

14. Plaintiff gave Defendant Thivierge his identification documents and asked why he was being detained.

15. Defendant Thivierge, told Plaintiff that he stopped him, because he saw Plaintiff's vehicle swerve.

16. Defendant Thivierge went back to his vehicle, presumably to check Plaintiff for warrants, while Defendant Nichols, and the other unknown police officers stayed positioned strategically around Plaintiff's vehicle.

17. Plaintiff was confused about the nature of the traffic stop, based on all the additional police officers that arrived, surrounding his car, in the Taco Bell parking lot, based on what was suppose to be a routine traffic stop.

18. It was later determined from the dispatch records, that Defendant Thivierge, dispatched the traffic stop, as a priority two call, which is a higher alert call, then it should've been dispatched

as, for a routine traffic stop, in violation of APD policy 8.4: Call Priority Designations, which is why all the additional police arrived.

19. Plaintiff complained about the nature of the stop to Defendants Thivierge and Nichols, because the seizure of his person and vehicle was unlawful.

20. Defendant Thivierge went back to the police vehicle, presumably to check Plaintiff for warrants.

21. After 10-15 minutes passed, Defendant Thivierge returned Plaintiff's identification.

22. Plaintiff threatened Defendants Thivierge, Nichols, and the unknown police officers with filing administrative and formal grievances and complaints against them for the unlawful stop and seizure of his person and vehicle.

23. The Plaintiff accused the Defendant police officers of racial profiling, requested their names and identification information, and informed them that he was filing an administrative complaint against them, for the misconduct, and a lawsuit to litigate the unlawfulness of their actions.

24. The Defendant Officers became irate and began yelling at Plaintiff, calling him derogatory names, e.g. stupid mother fucker, etc.; making derogatory remarks about his mother, e.g., calling her a bitch; and threatening Plaintiff with adverse action, e.g., arresting him (under false pretenses).

25. The Plaintiff didn't swerve or wasn't swerving, as Defendant Thivierge claims, to justify the traffic stop.

26. The Plaintiff was never issued a summons or traffic ticket related to any alleged traffic violations.

27. The Defendants stopped Plaintiff, without reasonable suspicion, probable cause, or any other legal basis, but stopped him, because they seen him leaving the King's motel, which is a high crime area in the City, and have a practice or custom of stopping blacks coming to or from the

King's motel. See Pittman v. Palacio, et al., 19-cv-01947; also see Pittman v. City of Aurora, et al, 19-cv-02209.

***Second Traffic Stop (Illegal Search)***

28. On 12/03/17, at 2:26am, less than three (3) hours after the first stop, Plaintiff was stopped again, leaving the King's Inn Motel, located at 11800 E Colfax Ave, Aurora, CO. 80010, to drop off his two passengers, who asked him for a ride, and then Plaintiff was going home.

29. As Plaintiff pulled out of the King's Inn Motel, headed east on Colfax Ave., a police vehicle immediately pulled behind him, and began to follow him, later determined to be Defendant Nichols, who was also involved in the first stop.

30. As Plaintiff turned on his blinker, to make a right turn on N. Peoria St., Defendant Nichols, turned on his emergency lights, to conduct a traffic stop.

31. Plaintiff then stopped his vehicle and parked in front of an appointment complex, and legally parked his vehicle.

32. Several Aurora Police Officers, in approximately 3-4 additional police cars, arrived on the scene, to assist Defendant Nichols, with their emergency lights activated, for what was supposed to be a routine traffic stop, to include, Defendants Coe, Sotelo, and Yarborough.

33. Plaintiff was confused about the nature of the traffic stop, based on all the additional police officers that arrived, based on what was supposed to be a routine traffic stop.

34. It was later determined from the dispatch records, that Defendant Nichols, dispatched the traffic stop, as a priority two call which is a higher alert call, then it should've been dispatched as, for a routine traffic stop, in violation of APD policy 8.4: Call Priority Designations, which is why all the additional police arrived.

35. Immediately upon the arrival of Defendants Coe, Sotelo, and Yarborough, Defendant Nichols and Yarborough, approached Plaintiff's vehicle, to initiate contact with him.

36. Defendant Nichols requested Plaintiff's identification documents.

37. Plaintiff gave Defendant Nichols his identification documents and asked why he was being detained.

38. Defendant Nichols explained, that Plaintiff's license plate lights weren't working or fully illuminating the license plate.

39. Defendant Nichols returned to his police vehicle, presumably, to conduct a warrant check on Plaintiff.

40. After running a criminal background check on Plaintiff, Defendant Nichols, got out of his vehicle, and huddled up with Defendants Coe, Sotelo, and Yarborough, at the back of his police vehicle that was parked behind Plaintiff's vehicle.

41. Whatever the Defendants discussed, at the back of Defendant Nichols vehicle, is a mystery, because as he approached Defendants Coe, Sotelo, and Yarborough, to talk to them, the Defendant officers turned off their body cameras, so the conversation wasn't recorded, and repeatedly turned their body cameras on and off during the entire encounter, in violation of APD Directives Manual section 16.4.

42. After their gathering, Defendant Nichols turned his body camera back on, returned to Plaintiff's vehicle, with Defendant Yarborough positioned strategically, and demanded him to step to the back of the vehicle.

43. When Plaintiff complied, Defendant Nichols explained, that he smelled alcohol illuminating from Plaintiff's car, and requested consent to search the vehicle, and explained, in so many words, if nothing was found in the vehicle, Plaintiff would be sent on his way.

44. Plaintiff took Defendant Nichols language to mean, if he allowed Defendant Nichols consent to search the vehicle, he would overlook the alcohol smell.

45. Plaintiff refused to give Defendant Nichols consent to search of his vehicle, and was suspicious as to why searching his vehicle was Defendant Nichols concern.

46. Immediately after Plaintiff refused to give Defendant Nichols consent to search his vehicle, he became openly agitated and went into the roadside sobriety test protocol, to determine if Plaintiff had been drinking alcohol.

47. Plaintiff refused to submit to the sobriety test, and was immediately placed under arrest, by Defendant Nichols, for DUI, based on his refusal.

48. Defendant Nichols then searched Plaintiff's person and took all the contents out of his pockets, including the keys to his vehicle.

49. Upon taking Plaintiff's car keys, Defendant Nichols placed him in the backseat of his patrol car.

50. Defendant Nichols, Coe, Sotelo, and Yarborough, approached the vehicle, and ordered the passengers out of the vehicle and told them to leave.

51. Defendant Nichols did not interview or take any statements from these witnesses.

52. Once the passengers were out of the vehicle and left the scene, Defendants Nichols and Yarborough, while the other Defendant police officers watched, began unlawfully searching the Plaintiff's vehicle, under the false pretenses of a "inventory search."

53. Defendant Nichols searched the front of the vehicle, while Defendant Yarborough searched the back.

54. During the search of the vehicle, you can hear Defendants Nichols, Coe, Sotelo, and Yarborough, discussing on the body camera footage, how they were looking for drugs, which is clearly not the purpose of inventory searches.

55. The Defendants conspired to have Plaintiff's vehicle impounded, to cover up and justify them conducting a search of the vehicle, under the guise of an "inventory search" of the vehicle, in violation of APD policy 08.16.1, related to inventory searches, and well established constitutional law.

56. In his police report, Defendant Nichols stated, that his reasoning for deciding to have the vehicle towed, was based on the vehicle being parked in a "no parking" zone, however, Plaintiff contend, that the vehicle was lawfully parked.

57. Furthermore, Defendants Nichols, Coe, Sotelo, or Yarborough, never presented to Plaintiff, the option to leave the vehicle at the scene (moved to a place of safety if needed), nor the option to release his vehicle to one of his passengers, in accordance to APD policy and constitutional law.

58. During the search, Defendants found a handgun, that was in the glove compartment, which they unlocked, without a warrant or probable cause, to search the glove compartment or the vehicle.

59. Plaintiff was ultimately charged with DUI and possession of a weapon by a previous offender ( POWPO), and convicted of DUI and a misdemeanor weapons related offense.

60. Plaintiff isn't challenging the legality of the traffic stop, nor is he challenging the convictions that resulted from the traffic stop, but challenging the illegal search and seizure of his vehicle, conducted in violation of APD policy and well established constitutional law.

61. Plaintiff contends that the Defendants illegally searched his vehicle, in violation of the Fourth Amendment to the United States Constitution, United States Supreme Court law, Colorado

Supreme Court law, and the City of Aurora and Aurora Police Department policy, with regard to the unlawful search and seizure of his vehicle.

62. The City of Aurora, and the Aurora Police Department directives manual ( policy and procedure), Title: 08.16.1: Towing and Release of Vehicles and Property, states in pertinent part, "Members are authorized to tow a vehicle from a street or any public way or place under the circumstances listed in Sec. 134-37 (authority to impound vehicles) or Sec. 134-148 (abandoned vehicle on street or highway) of the code."

63. The policy furthermore states, "In 'normal' arrest situations where the arrestee is in control of the vehicle and the vehicle is not needed as evidence, posing an imminent threat to public safety, or there is no probable cause to seize the vehicle, the option to leave the vehicle at the scene (moved to a place of safety if needed) or released to another party must be presented to the arrestee." Id.

64. Most importantly, the policy states, "A vehicle left at the scene may be released at the scene to a responsible, licensed party with the permission of the arrested driver. Vehicles will not be released to any person who is intoxicated or is suspected of being impaired." Id.

65. The Aurora Police Department policy on "Towing and Release of Vehicles and Property" is sound, and doesn't support the actions of the Defendants, who were set out to illegally search Plaintiff's vehicle from the onset of the investigative stop.

66. Plaintiff's vehicle was not needed as evidence, didn't pose an imminent threat to public safety, nor was there probable cause to seize and search the vehicle

67. Defendant Nichols, never documented in his police report, his reasoning for failing to present to Plaintiff, the option to release his vehicle to one of his passengers.

68. The facts show that Defendants Nichols, Coe, Sotelo, and Yarborough, were acting in "bad faith," by unlawfully searching Plaintiff's vehicle, under the guise of an "inventory search," were probable cause didn't exist, were the option to release his vehicle, to one of his passengers, was

12

never presented to Plaintiff, and where the facts show that searching Plaintiff's vehicle, was Defendants objective from the onset, were Defendant Nichols immediately requested Plaintiff's consent to search the vehicle, and body camera footage show that Defendants were searching the vehicle for drugs, because they suspected Plaintiff of possessing drugs. See Colorado v. Bertine, 479 U.S. 367 (1987).

69. The decision to tow the vehicle and the subsequent search of the vehicle, was outside the frame of APD policy, were the option to release his vehicle to one of his passengers, was never presented to Plaintiff. See Colorado v. Bertine, 479 U.S. 367 (1987); also see Aurora Police Department directives manual, Title: 08.16.1: Towing and Release of Vehicles and Property.

70. In Vigil v. Superior Court, County of Placer, the court, in the face of Cooper, held that an "inventory search" of defendant's vehicle violated the petitioners Fourth and Fourteenth Amendment rights. In disproving an earlier decision, the court found that custodial possession is not an inevitable concomitant of an arrest of the driver. The Court held that the constitution does not permit and otherwise authorize search of a car simply because police have statutory authority to arrest and take an accused before a magistrate plus the right to cause the automobile to be removed from the highway. People v. Anderson, 6 Cal. App. 3d 428, 85 Cal. Rptr. 908 (1970).

71. The court did not appear to question the right of police to take an inventory of a vehicle if the vehicle has been properly impounded. The court pointed out that petitioner was accompanied by two other occupants of the vehicle, who, with the consent of the arrestee, could have been given possession of the vehicle, thus avoiding the need for the impound. See id. at 133, 73 Cal. Rptr. at 797.

72. The Court's ruling in Heck denied the accrual of a §1983 claim for damages that would imply the invalidity of the plaintiff's conviction or sentence. In footnote seven of its opinion, the Court provided an example of a claim that might not imply the invalidity of the underlying conviction or sentence and that, consequently, would not require favorable termination: For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the §1983

plaintiff's still outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful. In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, which, we hold today, does not encompass the "injury" of being convicted and imprisoned (until his conviction has been overturned). Heck v. Humphrey, 512 U.S. 477, 487 n. 7 (1994).

73. Plaintiff is challenging the decision to tow his vehicle and the unlawful search of his vehicle, in violation of APD policy, and well established constitutional law, and not the subsequent arrest or conviction, therefore, a favorable judgment in this § 1983 lawsuit, would not imply the invalidity of his conviction, because of the doctrines, independent source, inevitable discovery, and harmless error.

74. The Defendants illegal search and seizure of Plaintiff's vehicle, in violation of APD policy and the Fourth Amendment to the United States Constitution, caused him actual, compensable injury, where Plaintiff had to pay hundreds of dollars to get his vehicle released from the APD impound; caused Plaintiff embarrassment and humiliation; and subjected him to mental anguish and emotional distress.

75. None of Plaintiff's injuries, encompass the "injury" of being convicted or imprisoned.

76. Upon information and belief, Defendant Yarborough was the employee with the final policymaking Authority on the scene, and had authority over his subordinate Law Enforcement Officers, Defendants Nichols, Coe, Sotelo, and other unknown Aurora Police Officers.

77. Through Defendant Yarborough's own unlawful conduct, which condones the conduct of Defendants Nicholls, Coe, Sotelo, and other unknown police officers, Defendant Yarbrough, on behalf of the City of Aurora, ratified the unconstitutional practices of Defendants Nichols, Coe, Sotelo, and other unknown police officers. Defendant's actions caused, directly and proximately, Plaintiff to suffer damage.

78. Plaintiff assert, that all of the named individual Defendants, including, but not limited to, Defendant Yarborough, were on scene, during the illegal search and seizure of his vehicle, and therefore, personally participated in the misconduct, and/or failed to intervene in the constitutional violations.

79. Defendants, as described above, were acting recklessly, knowingly, intentionally, willfully and wantonly, caused Plaintiffs injuries.

**Second Claim:** Municipal Liability- Deliberately Indifferent Training and Supervision Resulting in Violations of the Fourth & Fourteenth Amendments (against City of Aurora)

Supporting Facts:

80. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

81. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

82. This claim two is being leveled against Defendants City of Aurora, and the Aurora Police Department.

83. The Aurora Police Department is a subdivision of the City of Aurora.

84. Municipalities and their subdivisions may be held liable to an individual if they

enforce a policy or custom that causes the deprivation of an individual's constitutional rights.

85. Municipal liability may be based upon:

a. A formal promulgated policy;

b. A well settled custom or practice;

c. A final decision by a municipal policymaker; or

d. Deliberately indifferent training or supervision.

86. Defendant City of Aurora engaged in the following deliberately indifferent training and supervision practices that allowed for various constitutional violations:

a. Failure to train police officers on the proper protocol for impounding citizens vehicles;

b. Failure to ensure that police officers adhere to proper protocol for impounding citizens vehicles;

c. Failure to enforce punishment for violations of directives relating to the impounding of citizens vehicles;

d. Failure to train police officers on acceptable legal grounds for probable cause to search citizens vehicles;

e. Failure to ensure that police officers are only searching citizens vehicles on the basis of valid probable cause;

f. Failure to enforce punishment for vehicle searches carried out without valid probable cause.

g. Failure to train police officers on acceptable legal grounds for reasonable suspicion to stop citizens vehicles;

h. Failure to ensure that police officers are only stopping citizens vehicles on the basis of valid reasonable suspicion;

i. Failure to enforce punishment for vehicle stops carried out without valid reasonable suspicion.

87. After the above mentioned incidents, Plaintiff filed administrative complaints with the APD Internal Affairs Bureau.

88. In response, the bureau stated that the officers had done nothing wrong. These actions are consistent with Aurora's custom of condoning and ratifying unconstitutional behavior by its officers.

89. The City of Aurora, and the Aurora Police Department, have a lengthy and well-documented history of conducting unlawful searches and seizures.

90. The City of Aurora and it's police department compile data related to traffic stops, and keep records of the race of the citizens being stopped, searched, etc., called Open Data Policing.

91. Demographically, the City of Aurora is predominantly White.

92. Based on the American Community Survey conducted by the census in 2016, only 20,403 African-Americans, out of a population of 399,756, lives in the census tract where Plaintiff was stopped.

93. African-Americans only make up 10.2% of the City of Aurora. Comparatively, 113,581 whites live in that same census tract, making up 56.5% of the City of Aurora.

94. Although, African-Americans only make up 10.2% of the City of Aurora's population, blacks are twice as likely to be subjected to traffic stops than whites.

95. African Americans are twice as likely to be stopped, being subjected to traffic stops 20% of the time in the City of Aurora. Comparatively, whites makeup 56.5% of the City of Aurora's population, but only subjected to traffic stops 35% of the time, at a significantly less rate than African-Americans.

96. Even more compelling, is African-American persons and vehicles are searched at a significantly higher rate than whites during routine traffic stops.

97. For example, although African-Americans make up 10.2% of the City of Aurora's population, their persons and vehicles are searched 26% of the time, in comparison to whites who make up 56.5% of the population, who's persons and vehicles are searched 16% of the time.

98. The incidents involving Plaintiff, standing alone, in combination with Aurora's own statistics of data and records of traffic stops in the City of Aurora, is sufficient evidence of these customs, policies and/or practices.

99. Yet, there is more evidence of Aurora's unconstitutional customs, policies, and/or practices, regarding Fourth Amendment violations, stemming from illegal searches and seizures.

100. On November 9, 2016, Nakiko Diallo, an African American resident, of the State of Colorado, was pulled over, by Aurora police officer Matthew Milligan, in a traffic stop, for allegedly driving above the speed limit and having non-functioning tail lights. Officer Milligan observed an open container in the back of Plaintiff's vehicle and used this as pretext to allege that Mr. Diallo was driving while intoxicated. Field Training Officer Jason Oviatt and his trainee, Officer Alex Sotelo, arrived on the scene shortly thereafter. Mr. Diallo's friends approached Defendant Milligan to ask why their friend was being arrested and whether they could assume possession of his car. However, despite an APD policy that expressly allows for such a transfer of possession, Defendant Milligan refused to explore this option and instead opted to impound the vehicle. Defendant Milligan subsequently sought Mr. Diallo's consent to conduct an inventory search of the vehicle, but Mr. Diallo refused. Defendant Milligan then proceeded with the search nevertheless. Id. In a subsequent inventory search of Mr. Diallo's vehicle recorded by Officer Milligan's body camera, Officer Milligan can be seen searching a lunch box and finding no drugs or other contraband, then turning off his body camera. When Officer Milligan subsequently instructed Officer Sotelo to search that same lunch box again several minutes later,

drugs and other contraband are suddenly easily visible. See *NAKIKO DIALLO v. MATTHEW MILLIGAN, et al, #18-cv-02898.*

101. Plaintiff assert that the Diallo case, involve very similar circumstances and factors, as the above captioned case, however, Plaintiff will only discuss the facts relevant to this case.

102. The most important factor, in this case, in comparison to the Diallo case, is of Defendant Sotelo's involvement in both cases. At the time of the Diallo incident, Defendant Sotelo was a trainee, and Defendant Sotelo was trained to violate APD policy on the authority to tow and search vehicles, which ultimately violates the Constitution.

103. Like in the Diallo case, as in this case, the police Defendants, refused to explore the option of releasing Plaintiff's vehicle to his passengers, and instead opted to impound the vehicle, despite the APD policy that expressly allows for such a transfer of possession, in violation of the Fourth Amendment to the Constitution.

104. Although Plaintiff refused to give Defendants Nichols, Coe, Sotelo, and Yarborough, consent to conduct any type of search of his vehicle, let alone an inventory search of the vehicle, the Defendants proceeded with the search anyway.

105. The City of Aurora, Just like when Defendant Sotelo was a trainee, train their police officers, to conduct illegal searches of African-American citizens vehicles, without probable cause, no matter the circumstances, in direct violation of their own policies, as well as the Fourth Amendment, because their objective is to search vehicles by any means necessary.

106. On 01/19/19, after leaving the Kings Motor Inn, located at 11800 E. Colfax Ave., while traveling westbound on Colfax Ave., Teddy T. Pittman noticed he was being followed by an Aurora Police Officer, later determined to be Officer Darian Dasko. Officer Dasko followed Mr. Pittman for approximately 3 miles through the City of Aurora, then activated his emergency lights just as Mr. Pittman was crossing into Denver from Aurora. Mr. Pittman immediately stopped his vehicle at E. Colfax Ave. and N. Xanthia St. Mr. Pittman was scared because he had done nothing wrong, and didn't know why he was being stopped. Officer Dasko approached the

driver side of the vehicle and contacted Mr. Pittman and told Mr. Pittman that he was being stopped for a defective driver side headlamp and requested his identification documents. Mr. Pittman knew that the reason for the stop wasn't right, because there wasn't anything wrong with the headlamps on his vehicle. While sitting there waiting for Officer Dasko to return his identification documents, 8-10 police officers arrive on the scene as backup, including Officers Palacio and Veith. Officer Dasko returned to Mr. Pittman's vehicle and demanded him to step out of the vehicle, so he could search Mr. Pittman's person and vehicle for weapons and drugs. Officer Dasko did not have reasonable suspicion to believe that Mr. Pittman had committed any crimes. When Mr. Pittman protested, Officers Dasko and Veith, put Mr. Pittman in a twist lock, pulled him out of his vehicle, and searched Mr. Pittman's person and vehicle by force, without his consent. See *PITTMAN v. PALACIO, et al., #2019-cv-01947.*

107. On 04/03/2019 after returning to the Kings Motor Inn, located at 11800 East Colfax Avenue, while pulling into the parking lot, Mr. Teddy T. Pittman, was stop by Aurora police Officer Delbert L Tisdale Jr. And several other Aurora police officers. These officers came out of nowhere, activated their emergency lights, and swarm Mr. Pittman's vehicle, as he pulled into the parking lot of the motel. Mr. Pittman immediately stopped his vehicle. He was scared. He hadn't done nothing wrong. Officer Tisdale, approached the driver's side approached the driver side, and requested Mr. Pittman's identification documents. Mr. Pittman, handed Officer Tisdale identification documents. Officer Tisdale did not explain to Mr. Pittman, why he stopped him. Officer Tisdale return to his vehicle presumably to run a warrant check on Mr. Pittman. While waiting for Officer Tisdale to return his identification documents, Mr. Pittman noticed several unknown police officers arrive on the scene as backup. When Officer Tisdale returned to Mr. Pittman's vehicle, he demanded his to step out of his vehicle, whereas he could search Mr. Pittman's person and vehicle for drugs and weapons. Mr. Pittman exercised my rights and refused to consent to the search of his person and vehicle, and explained to Officer Tisdale, that he did not have the authority or the right to search his person or vehicle, and refused to get out of his car. Immediately after he refused to give consent to search of his person and vehicle, Officers Tisdale, Zimmerman, McElroy, and Spano, put him in a Twist lock, and forced him out of his

vehicle, then unlawfully searched Mr. Pittman's person and vehicle, by force, and without his consent. See *PITTMAN v. CITY OF AURORA, et al., #19-cv-02209.*

108. On September 2, 2019, September 17, 2019, and November 29, 2019, Mr. Jehrone D. Falls, was stopped by numerous Aurora police Officers, on three separate occasions, within weeks apart, and subjected to searches of his person and vehicle, without probable or any legal basis to justify the searches, in direct violation of APD policy, and the Fourth Amendment. The following Aurora police officers were involved in the illegal searches and seizures on Mr. Falls vehicles: Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer. See *FALLS v. CITY OF AURORA, et. al., 19-cv-03722.*

109. Some of the aforementioned police officers, have been involved in more the one of the above mentioned cases.

110. Defendant City of Aurora's indifferent employee training and supervision practices were: (1) deliberately or recklessly indifferent to Mr. Handy's constitutional rights; and (2) deliberately or recklessly indifferent to whether citizens and their vehicles were being wrongfully detained and searched without regard to rather reasonable suspicion or probable cause existed, to justify said conduct.

111. As a direct and proximate result of the City of Aurora's indifferent employee training or supervision practices, Mr. Handy was unlawfully detained without reasonable suspicion during the first investigative stop, and had his vehicle unlawfully towed and searched, without probable cause, during the second investigative stop, in violation of APD policy and the Fourth Amendment.

112. During this time, Mr. Handy endured substantial emotional and pecuniary injuries.

113. Defendants, as described above, were acting recklessly, knowingly, intentionally, willfully and wantonly, caused Plaintiffs injuries.

**E. REQUEST FOR RELIEF** *State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

Plaintiff requests the following relief:

A) Appropriate declaratory and other injunctive and/or equitable relief as to each Defendant in their individual capacities;

B.) Compensatory and general damages on all claims allowed by law, in an amount to be determined at trial from all defendants named in their individual and official-capacities;

C.) Punitive damages and exemplary damages on all claims allowed by law in an amount to be determined at trial from all defendants named in their individual and official capacities;

D.) A trial by jury;

E.) Pre-and-Post judgment interest at the lawful rate;

F.) Any further relief that this Court deems just, proper and equitable.

**F. PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

W.T. Handy Jr.

P.O. Box 221531

Denver, CO 80222

Dated: 01-29-2020

(Revised December 2017)